Jerome CROWLEY, Anthony Coyne, Joseph Fahey, Robert Lunnin, James Hayes, Gerald Owens, John Lynch, Joseph Trask, Joseph Montagna, and Dennis Bates, Plaintiffs-Appellees,

v.

LOCAL NO. 82, FURNITURE AND PIANO MOVING, FURNITURE STORE DRIVERS, HELPERS, WAREHOUSEMEN, AND PACKERS; Bart Griffiths, Secretary-Treasurer, Local No. 82; George Harris, President, Local No. 82; Phillip Piemontese, Chairman of the Election Committee of Local 82; and John Doe, James Doe and Jerome Doe, Members of the Election Committee of Local 82, Defendants-Appellants.

Raymond J. Donovan, Secretary of Labor, United States Department of Labor, Intervenor.

No. 81–1545.

United States Court of Appeals, First Circuit.

Argued Jan. 6, 1982.

Decided May 21, 1982.

Gary S. Witlen, Washington, D. C., with whom Kathryn Noonan, Boston, Mass., was on brief, for defendants-appellants.

Kurt M. Pressman, Cambridge, Mass., with whom Mark D. Stern, Benjamin Hiller, and Goldstein, Pressman & Stern, Cambridge, Mass., were on brief, for plaintiffs-appellees.

Susan M. Webman, Atty., U. S. Dept. of Labor, Washington, D. C., with whom T. Timothy Ryan, Jr., Sol. of Labor, John F. Depenbrock, Associate Sol., and Joseph M. Woodward, Atty., U. S. Dept. of Labor, Washington, D. C., were on brief, for The Secretary of Labor, amicus curiae.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, and Packers, International Brotherhood of Teamsters (the Local) and certain of its individual officers [1] appeal the order of the district court issuing a preliminary injunction against them that principally requires the Local to conduct new elections for officer positions in the Local. The injunction was sought by several members of the Local, Jerome Crowley, Anthony Coyne, Joseph Fahey, Robert Lunnin, James Hayes, Gerald Owens, John Lynch, Joseph Trask, and Joseph Montagna, who raised a number of claims regarding the

---

1. These officers are Bart Griffiths, Secretary-Treasurer; George Harris, President; Phillip Piemontese, Chairman of the Election Committee of the Local; and other unidentified members of the Election Committee.

Local's conduct of nominations and elections in November and December, 1980. The claims all arose under the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 401–531. The primary question posed here is whether the district court had jurisdiction under Title I of the LMRDA, 29 U.S.C. §§ 411–415, to grant the injunction, or whether, as appellants contend, the plaintiffs' only recourse was to the Secretary of Labor under Title IV of the Act, 29 U.S.C. §§ 481–483. The Secretary of Labor has intervened on the side of appellants because of his concern over this issue. Additional questions in this appeal concern the propriety of the preliminary injunction under traditional equitable doctrines and the district court's refusal to require plaintiffs to post bond. We have jurisdiction under 28 U.S.C. § 1292(a)(1).

This case concerns only one event, the meeting held by the Local on November 9, 1980, for the nomination of candidates for positions in the Local. The November 9 meeting attracted more interest than was usually shown in the Local's monthly meetings, which was due in part to the efforts of dissident members to gather support to turn the then-current Local officials out of office. Two aspects of the meeting provoked considerable controversy. First, admission to the meeting was restricted to those members who had with them a computerized receipt (the TITAN receipt) showing that their dues had been paid up to date. Several members were denied admission because they did not have TITAN receipts, and they became angry and vocal. At one point, four of the men outside the meeting, plaintiff Lunnin, Kenneth Sprague, and two others, entered the meeting to see Bart Griffiths, the secretary-treasurer of the Local, about easing the rule. Griffiths refused to alter the rule or to allow the shop stewards to check their own dues records and admit paid-up members, but he

offered to hold up the meeting for an hour in order to allow members to return home to pick up their receipts. The four-man delegation refused this offer. Lunnin and Sprague, however, had their receipts and were admitted. At the hearing before the district court, both sides presented evidence concerning the regularity with which the TITAN receipt requirement was imposed at Local meetings.

The second controversy occurred when nominations were made. Before nominations began, Griffiths read aloud lists of members ineligible and eligible for candidacy, eleven on the ineligible list and sixteen on the eligible list. Four of the plaintiffs, Crowley, Coyne, Lunnin, and Hayes, were ineligible; one, John Lynch, was on the eligible list. Eligibility was based on timely payment of dues.[2] The remainder of the approximately 750 members of the Local, including plaintiffs Fahey, Owens, Trask, Montagna, and Bates, were on neither list.[3] At this point, proceedings began to break down—several members often spoke at once—and order was never fully restored. Questions were raised concerning eligibility requirements and the lists, and, at least in the minds of some, Griffiths did not answer them adequately. Nominations were then opened. Griffiths was nominated for secretary-treasurer, and according to the plaintiffs, Lynch was as well. At the close of nominations, however, Griffiths declared himself the sole nominee for secretary-treasurer and included Lynch among the candidates for president. Protests were unavailing. Nominations for other positions went on while similar turmoil prevailed, but plaintiffs' principal objection, and the important fact for this appeal, concerns Lynch's nomination.

Plaintiffs then filed suit in federal district court, alleging ten claims, five of them charging denials of equal rights in violation

---

**2.** No evidence was introduced specifically on this point, but apparently a TITAN receipt did not reflect whether one's dues payments had been timely.

**3.** Testimony about the status of these members was unclear. Evidence most favorable to appellants indicates that these members were probably eligible, but records about the timeliness of their payments had not yet been checked or were not readily available.

of 29 U.S.C. § 411(a)(1),[4] three for denials of free expression of views in violation of 29 U.S.C. § 411(a)(2),[5] one for unlawful discipline in violation of 29 U.S.C. § 411(a)(5),[6] and one for a violation of the right to nominate candidates protected under 29 U.S.C. § 481(e).[7] The complaint, seeking preliminary relief, was filed on December 1, 1980, after the nomination meeting but before the subsequent by-mail election had been completed.

On December 12, in order to preserve the status quo and to protect its own jurisdiction, the district court issued a temporary restraining order preventing the Local from counting the ballots, some of which had already been received. Several days of hearings on a preliminary injunction, and many more days of negotiations regarding the terms of an order followed. On July 13, 1981, the district court, 521 F.Supp. 614, issued a preliminary injunction and memorandum opinion. In its memorandum, the district court concluded that plaintiffs had shown a substantial likelihood of success in demonstrating that the imposition of the TITAN receipt requirement and the refusal

to allow Lynch to run for secretary-treasurer both violated their equal right to nominate and their right to express views freely, 29 U.S.C. § 411(a)(1), (2). In the meantime, the Local had dropped the charges against the member that had given rise to the unlawful discipline claim. The injunction that the district court issued set aside the earlier nomination and election and established procedures for a new nomination and election to be overseen by a third party, Lawrence Katz and the Honest Ballot Association of New England. The order also enjoined the defendants from interfering with equal rights of the Local members to participate in meetings of the Local regarding the election and to express their views freely about the election. The plaintiffs were not required to post security under Fed.R. Civ.P. 65(c). Defendants sought a stay of the order in the district court, which it denied, and in this court, which we denied, and this appeal followed.

Appellants challenge the order below on three grounds: the district court lacked remedial jurisdiction under Title I of the LMRDA to order a new election and the

---

**4.** 29 U.S.C. § 411(a)(1) provides as follows:

> *(a)(1) Equal rights.*—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

**5.** 29 U.S.C. § 411(a)(2) provides as follows:

> *(2) Freedom of speech and assembly.*—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere

with its performance of its legal or contractual obligations.

**6.** 29 U.S.C. § 411(a)(5) provides as follows:

> *(5) Safeguards against improper disciplinary action.*—No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

**7.** 19 U.S.C. § 481(e) provides in relevant part as follows:

> (e) In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 of this title [29 U.S.C. § 504] and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof.

procedures therefor;[8] the preliminary injunction is improper under traditional equitable principles; and the district court improperly refused to require plaintiffs to post a bond. The Secretary of Labor (the Secretary) essentially joins appellants in their first argument and adds that the district court's TRO, issued in part to preserve the district court's jurisdiction, was error. In order to determine the propriety of the preliminary injunction (and the absence of posted security), we must decide whether the district court had jurisdiction to order a new election at all. This issue involves reconciliation of Titles I and IV, particularly of their respective jurisdictional provisions, 29 U.S.C. §§ 412, 483, which are in apparent conflict.

## I. *Remedial Jurisdiction*

The jurisdictional argument posed by appellants and the Secretary rests on the proposition that the district court erroneously reconciled the conflict between Titles I and IV of the LMRDA. Summary of these Titles explains the conflict. Title IV sets out in some detail a number of requirements union elections must fulfill. 29 U.S.C. § 481. Included are such matters as frequency of elections, rights of candidates involving distribution of campaign material and opportunity to reach union members, reasonable opportunity for union members to nominate and elect candidates, use of union dues, and removal of union officers. *Id.* As to actual nomination and election procedures, Title IV seeks to give members in good standing an opportunity to participate but leaves procedural details largely up to union constitutions and bylaws. *Id.* To enforce his Title IV rights, a union member must first exhaust his internal union remedies and then may request the Sec-

retary to investigate and enforce his rights. 29 U.S.C. § 482(a), (b). The Secretary may sue for a court-ordered new election, 29 U.S.C. § 482(c), but the union member has a very limited right to judicial review of the Secretary's decision not to sue, *Dunlop v. Bachowski*, 421 U.S. 560, 572–73, 95 S.Ct. 1851, 1860, 44 L.Ed.2d 377 (1975) (review standard is arbitrary and capricious). Title IV further provides that

> [e]xisting rights and remedies to enforce the constitution and bylaws of a labor organization with respect to elections prior to the conduct thereof shall not be affected by the provisions of this subchapter. The remedy provided by this subchapter for challenging an election already conducted shall be exclusive.

29 U.S.C. § 483. It is on the apparent exclusivity of the Title IV remedy that appellants and the Secretary rely.

Title I is the so-called "bill of rights" for union members and provides broader rights than Title IV, including equal rights to participate in the nominating and electoral process, the rights to express views freely and to assemble with other union members, a referendum requirement for dues increases, prohibition of union-imposed limitations on a member's right to sue, and protection against improper disciplinary action. 29 U.S.C. § 411(a). Enforcement of these rights is as follows:

> Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate.

29 U.S.C. § 412.[9] In the instant case, plaintiffs sued under this provision, and the dis-

---

**8.** Appellants' main brief suggests that the district court did not have jurisdiction even to hear the Title I claims, although their reply brief disclaims this argument. In any event, discussion of this point is included in the discussion of the district court's remedial jurisdiction.

**9.** The Title I enforcement procedure also requires that union members exhaust internal

union remedies over a four-month period before bringing suit. 29 U.S.C. § 411(a)(4). Appellants and the Secretary do not challenge the district court's finding that plaintiffs' filing of a complaint with Teamsters Joint Council 10, Local 82's supervisory body, and the Council's denial of the complaint constituted sufficient exhaustion.

trict court took jurisdiction thereunder.[10] The question is whether Title IV, particularly § 483, preempts Title I—at least to the extent that the district court may not order a new election—where ballots for a union election have been sent out, some have been returned, and none have been counted. Section 483 provides that the process established in Title IV "for challenging an election already conducted shall be exclusive."

Although it would appear that the answer to this question lies in deciding only whether the election here has already been conducted, the Supreme Court has advised against a literal reading of legislation.

We have cautioned against a literal reading of congressional labor legislation; such legislation is often the product of conflict and compromise between strongly held and opposed views, and its proper construction frequently requires consideration of its wording against the background of its legislative history and in the light of the general objectives Congress sought to achieve. See, e.g., National Woodwork Mfrs. Assn. v. NLRB, 386 U.S. 612, 619 [87 S.Ct. 1250, 1254, 18 L.Ed.2d 357]. The LMRDA is no exception.

Wirtz v. Local 153, Glass Bottle Blowers Ass'n, AFL–CIO, 389 U.S. 463, 468, 88 S.Ct. 643, 646, 19 L.Ed.2d 705 (1968) (footnote omitted).

The precise scope of Title IV's exclusivity in relation to Title I is obscured by the earlier reference in § 483 to "existing rights and remedies." It can be argued that § 483 does not impinge upon Title I at all because Title I is not an existing right or remedy within the meaning of § 483. This argument, which we do not adopt but merely posit, can be derived from a reading of the legislative history: Congress contemplated only that state law rights and remedies would be preempted by Title IV when it was considering the enactment of § 483. See infra at 989–990. We therefore

deem it appropriate to analyze the tension between Titles I and IV before deciding whether the election in this case was "already conducted" for purposes of § 483. It is also necessary to determine whether plaintiffs alleged genuine Title I or Title IV claims. We address first the relationship between Titles I and IV, and before turning to the legislative history, we look to the case law for guidance.

Appellants rely heavily on Calhoon v. Harvey, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964), in contending that the district court lacked jurisdiction to order a new election, and indeed that case is widely considered the starting point for examining the tension between Titles I and IV. Calhoon involved a pre-election attack on certain provisions of a union's bylaws and national constitution that prevented a union member from nominating anyone but himself for union office and that restricted nominating rights to union members of five or more years standing who had served a specified amount of sea time in recent years. Plaintiffs in Calhoon claimed that these rules deprived them of their equal right to nominate candidates under 29 U.S.C. § 411(a)(1). District court jurisdiction was therefore argued to be available under 29 U.S.C. § 412. The Supreme Court rejected this argument, stating that a court did not have jurisdiction under § 412 where any of the claims charged in substance a breach of Title IV rather than Title I rights. Calhoon v. Harvey, 379 U.S. at 138, 85 S.Ct. at 295. Title IV, the Court said, set the standards for eligibility and qualifications of candidates and officials. Id. Section 411(a)(1) of Title I, on the other hand, only provided that union members not be discriminated against in their right to nominate and vote, and even this protection was subject to reasonable rules and regulations of the union. Id. at 139, 85 S.Ct. at 295. The Calhoon plaintiffs challenged eligibility rules themselves, not any discriminatory application of them, and so actually alleged

**10.** The district court found, however, that it lacked jurisdiction over plaintiffs' Title IV right-to-nominate claim and over a claim alleging that substantially the same facts violated Title I.

Title IV claims. *Id.* The limitation on their ability to pursue essentially Title IV claims was so, the Court went on, because Congress intended the more technically competent Secretary of Labor to handle union election issues and sought to allow unions great latitude in resolving their own disputes. *Id.* at 140, 85 S.Ct. at 296. Justice Stewart concurred, observing that he would allow a district court to take jurisdiction of Title IV claims where it was asserted that union rules "effectively distorted the basic democratic process." *Id.* at 147, 85 S.Ct. at 299 (Stewart, J., concurring).

In subsequent LMRDA decisions, the Supreme Court discussed at greater length the nature of Title IV. In *Wirtz v. Local 153, Glass Bottle Blowers Ass'n, AFL–CIO,* 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705, the Court observed that Title IV's "special function ... is to insure 'free and democratic' elections," *id.* at 470, 88 S.Ct. at 647 (footnote omitted). The content of Title IV, the Court continued, reflected the resolution of a vigorous debate in Congress over the competing policies of correcting abuses in union elections and avoiding "unnecessary governmental intrusion into internal union affairs." *Id.* at 470–71, 88 S.Ct. at 647–48. Thus, under Title IV, unions enjoyed great latitude to settle internal disputes, but when they could not do so, the most skilled government agency, the Labor Department, would step in. *Id.* at 471, 88 S.Ct. at 648 (citing *Calhoon v. Harvey,* 379 U.S. at 140, 85 S.Ct. at 296). This enforcement scheme, the Court observed elsewhere, is intended to conform to "the longstanding congressional policy against unnecessary governmental interference with internal union affairs." *Hodgson v. Local 6799, United Steelworkers,* 403 U.S. 333, 338, 91 S.Ct. 1841, 1845, 29 L.Ed.2d 510 (1971). In *Trbovich v. UMW,* 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972), a decision that permitted a union member to intervene in a Title IV action brought by the Secretary, the Court noted that § 483 provided "the 'exclusive' post-election remedy for a violation of Title IV," *id.* at 531, 92 S.Ct. at 632. The reasons for Title IV's exclusivity in these cases were "(1) to protect unions from

frivolous litigation and unnecessary judicial interference with their elections, and (2) to centralize in a single proceeding such litigation as might be warranted with respect to a single election." *Id.* at 532, 92 S.Ct. at 633. Further reference to the exclusivity of Title IV in a post-election case came in a decision allowing a union member to seek judicial review of the Secretary's decision not to sue after receiving a Title IV complaint, *Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). The Court stated that

> [c]ertain LMRDA provisions concerning pre-election conduct, 29 U.S.C. §§ 411–413 and 481(c), are enforceable in suits brought by individual union members. Provisions concerning the conduct of the election itself, however, may be enforced only according to the post-election procedures specified in 29 U.S.C. § 482. Section 483 is thus not a prohibition against judicial review but simply underscores the exclusivity of the § 482 procedures in post-election cases.

*Id.* at 566–67, 95 S.Ct. at 1857. The effect of these discussions, none of which are part of the *ratio decidendi* of the cases, is not entirely clear. The impact of Title IV's exclusive remedy on a Title I claim arising in an election is nowhere discussed. Moreover, while the Court speaks of Title IV's exclusivity, *Trbovich* and *Bachowski* "plainly evince greater solicitude for aggrieved union members, and invite greater harassment of offending unions; in so doing, they undercut *Calhoon's* policy of non-interference." *Bunz v. Moving Picture Machine Operators Local 224,* 567 F.2d 1117, 1124 (D.C.Cir.1977) (Wilkey, J.) (footnote omitted).

[1] Courts of appeals have in a few cases addressed the question of a Title I violation occurring during a union election, primarily in cases involving a denial of equal rights. Jurisdiction of a Title I claim in a union election has been upheld on the theory that prompt, effective relief for violations of Title I rights—particularly for discrimination during an election—requires that a court be allowed to take jurisdiction

without forcing an aggrieved union member's claim to undergo review by the Secretary. *Kupau v. Yamamoto,* 622 F.2d 449, 455 (9th Cir. 1980). In addition, the exclusivity clause of § 483 does not clearly preclude jurisdiction of Title I claims, and when the Supreme Court speaks of the exclusivity of the Title IV remedy, it is careful to speak of its exclusivity only as to Title IV rights. *Id.* (citing *Calhoon v. Harvey,* 379 U.S. at 140, 85 S.Ct. at 299). Elsewhere, the question has been phrased only in terms of a cause of action:

> [T]he crucial question for the court is whether or not a union member has been discriminated against in one of the rights enumerated in [§ 411(a)(1)]. If such discrimination is present, a cause of action exists under [§ 411(a)(1)] regardless of other claims; absent such discrimination, the courts have no such jurisdiction.

*Depew v. Edmiston,* 386 F.2d 710, 712 (3d Cir. 1967) (footnote omitted). Similar reasoning appeared in *McNail v. Amalgamated Meat Cutters, AFL–CIO,* 549 F.2d 538, 540 (8th Cir. 1977). With respect to free speech rights, "[w]hen rights of free speech and of association—as opposed to the rights of voting and election—of union members are invaded by the actions of union officers, the requirement of initial appeal to the Secretary under Title IV is inapplicable," *Schonfeld v. Penza,* 477 F.2d 899, 903 (2d Cir. 1973), and jurisdiction under Title I is available.

Our review of the legislative history persuades us that these decisions correctly refused to find Title I election claims and remedies preempted by Title IV. What was to become the LMRDA was reported out of the Senate Committee on Labor and Public Welfare as S. 1555. This Senate bill contained no provisions comparable to the current Title I provisions, but it did have provisions regarding union elections that were substantially similar to those now contained in Title IV. In particular, the rules regarding elections were to be enforced by the Secretary of Labor on complaint from union members. S. 1555, § 302; S.Rep.No. 187, 86th Cong., 1st Sess., *reprinted in* [1959] U.S.Code Cong. & Ad.News, 2318, 2337–38, 2364–65.[11] Union members retained existing rights and remedies to enforce union election rules before an election was conducted, but complaint to the Secretary was the only avenue open for challenging an election already held. S. 1555, § 303; S.Rep.No.187 at 2338, 2365. The existing rights and remedies at this time all derived from state law and union constitutions and bylaws. The result of these provisions was that all pre-election relief was at state law, and post-election relief was exclusively a matter of federal law. S.Rep. No.187, Minority Views, Appendix B, at 2408.

Dissenting members of the Senate Committee and others objected to the lack of a "bill of rights" for union members as against the union in S. 1555, S.Rep.No.187, Minority Views at 2374–75 (Senators Goldwater and Dirksen), and appropriate amendments were offered to the Senate bill by Senators McClellan and Kuchel, 105 Cong.Rec. 6475–76 (1959) (McClellan amendment); *id.* at 6693–94 (Kuchel amendment). The McClellan amendment, introduced first, established several rights for union members, including equal rights and free speech, and empowered the Secretary to seek injunctions and other relief to enforce those rights. The principal objection to this amendment came from many of the proponents of S. 1555, who were concerned that these statutory rights would preempt state and federal rights union members already enjoyed, *see* 105 Cong. Rec. 6481–87 (1959) (remarks of Sen. Kennedy),[12] and would operate to hamstring

---

11. Hereinafter cited as S.Rep.No.187 with page citations to [1959] U.S.Code Cong. & Ad.News.

12. Senator Kennedy was one of the sponsors of S. 1555 and its floor manager in the Senate. Among his remarks were the following:

> I think the amendment raises the question of preemption. In other words, if the proposal were enacted, the present rather exhaustive remedies provided under the common law of the various States might be wiped out, and only the rights suggested by [Senator McClel-

legitimate union activities, *see* 105 Cong. Rec. 6721 (1959) (remarks of Sen. Church). Some opposition was also voiced to the provision for enforcement by the Secretary on the grounds that the availability of injunctive relief would deny defendants a trial by jury in suits brought by the government and that it would set an undesirable precedent for federal enforcement of racial integration and civil rights. *See* 105 Cong.Rec. 6696 (1959) (remarks of Sen. Johnston).

The McClellan amendment was passed by a one-vote margin, but three days later it was replaced by the Kuchel amendment, which contained a bill of rights responsive to the concerns aired about the McClellan amendment. The Kuchel amendment redefined and narrowed union members' rights slightly in order to give unions more leeway to conduct their affairs reasonably. The Kuchel amendment also included a clause declaring that the "bill of rights" did not limit any other rights and remedies union members possessed. 105 Cong.Rec. 6694 (1959) (§ 103). The McClellan amendment had been similarly modified earlier. 105 Cong.Rec. 6487 (1959). One of the major changes effected by the Kuchel amendment was to provide for enforcement by individual union members, not by the Secretary, as follows:

> Sec. 102. Any person whose rights secured by the provisions of this title have been infringed may bring an action in a district court of the United States for such relief as may be appropriate.

105 Cong.Rec. 6694 (1959). According to Senator Kuchel, this change was in the "interest of justice." 105 Cong.Rec. 6720 (1959). Senator Kefauver's explanation of his preference for the Kuchel amendment over the McClellan amendment is perhaps more illuminating:

> lan] would then be available to union members.
> 105 Cong.Rec. 6482 (1959).
> [I]n order to prevent [the McClellan] amendment from preempting the field, certainly additional language would be required either in the bill or in the amendment of [Senator McClellan].
> *Id.*

> I wish to congratulate the sponsors of the [Kuchel] amendment on the amendment they have presented, leaving out section 103 [of the McClellan amendment], which, as has been stated, would put the Secretary of Labor in the middle of the actions of every labor union in the United States and give him the right to institute suits at his will. It would be very difficult to carry on management-labor relations in the public interest if an unthoughtful Secretary of Labor wished to interfere. This section, plus the absence of a requirement for jury trials, were the principal reasons I voted against the McClellan amendment.

105 Cong.Rec. 6726 (1959).

After passage, S. 1555 went to the House, where the Committee on Education and Labor reported out a modified version of the bill. In addition, two other bills, the Landrum-Griffin bill and the Shelley bill, were presented to the House. All three bills contained roughly similar "bill of rights" and election procedure provisions.[13] As to elections, all three bills allowed aggrieved union members themselves to bring suit in federal district court (after exhausting internal remedies for a certain period) for appropriate relief for violations of election (Title IV) rights, including a new election supervised by the Secretary of Labor. H.R. 8342, § 402; H.Rep.No.741, 86th Cong., 1st Sess., *reprinted in* [1959] U.S.Code Cong. & Ad.News 2439, 2465–66;[14] 105 Cong.Rec. 15707 (1959) (Landrum-Griffin bill); *id.* at 15716 (Shelley bill). This process was, in all three bills, the exclusive means by which union members could attack improperly held elections, but members retained rights at state law to challenge pre-election violations. H.R. 8342, § 403; H.Rep.No.741 at 2439–40, 2466; 105 Cong.Rec. 15707 (1959) (Landrum-Griffin bill); *id.* at 15716 (Shelley

**13.** The principal differences between the bills concerned matters not at issue here, such as secondary boycotts and hot cargo practices.

**14.** Hereinafter cited as H.Rep.No.741 with page citations to [1959] U.S.Code Cong. & Ad.News.

bill). Indeed, the language of exclusiveness in all three bills was identical to that contained in S. 1555 and now in 29 U.S.C. § 483. The apparent purpose of the exclusivity clause was the same as in the Senate: to preempt state remedies after a union election had occurred but otherwise to save them. *See* 105 Cong.Rec. 15689 (1959) (remarks of Cong. Brademas) (one of major provisions of committee bill is to preserve "members' rights to enforce [a] union's constitution under State laws with respect to trusteeships and safeguarding fair procedures before an election."). With respect to enforcement procedures, the only explanation for the House's preference for enforcement of election rights by individual members rather than by the Secretary was given by Congressman Teller.

> [A] sharp departure of our committee bill from S. 1555 has to do with the extent to which the obligations of the proposed law are given over to the Secretary of Labor for enforcement. S. 1555 goes overboard on this; the Secretary of Labor is given enormous powers of rulemaking and enforcement. Estimates of the annual cost of administering S. 1555 have varied from $25 million to anywhere up to $100 million. Our committee bill H.R. 8324 substitutes the courts for the Secretary in most instances, and provides remedies which aggrieved individuals may enforce without the Secretary's permission. This will save the taxpayer millions of dollars annually, and accords with our traditions without reducing the effectiveness of the enforcement procedure.

105 Cong.Rec. 15681–82 (1959) (remarks of Cong. Teller). Violations of "bill of rights" protections were to be similarly remedied under all three bills: after exhausting internal union remedies over a certain period, aggrieved members could bring suit in federal district court for appropriate relief. H.R. 8342, § 402 (committee bill); 105 Cong.Rec. 15704 (1959) (Landrum-Griffin bill); 105 Cong.Rec. 15713 (1959) (Shelley bill).

The House passed the Landrum-Griffin bill, and it, together with the Senate bill, went to conference. With respect to the "bill of rights," the conference committee retained the House provisions, including enforcement by individual union members. Conf.Rep.No.1147, *reprinted in* [1959] U.S. Code Cong. & Ad.News 2503, 2503–04. The committee followed, however, the Senate provisions covering complaints of violations of election rules; only the Secretary was authorized to sue to set aside an improperly held election. Conf.Rep.No.1147, *reprinted in* [1959] U.S.Code Cong. & Ad.News 2503, 2507. As both Senate and House bills had suggested, this remedy for an improperly held election, once conducted, was exclusive. S. 1555, § 403; H.R. 8342, § 403 (as amended by Landrum-Griffin bill).

This history suggests that Congress intended the Secretary to have considerable responsibility for examining union elections, but it does not suggest that Congress sought to oust the federal courts of jurisdiction over complaints involving union elections. The exclusiveness of the Title IV remedy in certain cases was intended to exist only vis-a-vis state remedies; there is no evidence that limitations on Title I by Title IV were ever contemplated. Moreover, while Congress recognized that authorization of the Secretary to enforce Title IV would serve the functions of screening out nonmeritorious claims and avoiding a plethora of suits challenging the same election, *see Trbovich v. UMW*, 404 U.S. at 532, 92 S.Ct. at 633—policies that appellants and the Secretary emphasize in the instant appeal—this same reasoning might have been applied to Title I but was not. Indeed, Senators opposing authorization of the Secretary to enforce Title I suggested that it would create undue interference in labor-management relations, which would thwart achievement of broader goals of improving such relations. The apparent feeling in the House was that enforcement by the Secretary would be too expensive, as well as too intrusive.

We conclude that the different purposes that Congress sought to have Titles I and IV serve do not require, absent a specific statutory provision, that a federal district court be foreclosed from taking jurisdiction

of a Title I claim in an election case such as this one, where ballots have been sent out, some have been received, and none have been counted. This result respects the special competencies of both the courts and the Secretary. The rights protected by Title I, particularly equal rights to participate in union elections, free speech, and due process, 29 U.S.C. § 411(a)(1), (2), (5), are in the nature of rights traditionally protected by federal courts. Title I rights are not rights as to which the Secretary has particular expertise, so it is unnecessary for him to perform a screening function. Furthermore, these rights are individual—as opposed to the "group" right of members to an election conducted in accordance with the union constitution and bylaws and 29 U.S.C. § 481(e)—so enforcement of such rights by individual members in the courts will not substantially undermine the consolidation function performed by the Secretary in a Title IV case. That is, suits involving Title I rights will produce individual fact patterns, and, even if several suits are brought, conflicting or redundant rulings are not likely to emerge, and unions will not be burdened unfairly by litigation.

While we conclude that pursuit of Title IV's goals do not preempt Title I in the instant case, two questions remain. First, were the plaintiffs' claims genuine Title I claims or only Title IV claims to which the Title I label was affixed? Second, was the election in this case "already conducted" for purposes of § 483 with the result that it was outside the district court's jurisdiction even though other Title I election cases would not be?

■ The first question is important because by fashioning rules to distinguish Title I and Title IV causes of action, federal courts have developed a pragmatic method for, in many instances, reconciling the two titles and allowing them to operate in their separate spheres. Concern with the sufficiency of a Title I claim began in *Calhoon v. Harvey*, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190, where the mere labelling of claims as Title I claims was held insufficient, *id.* at 138, 85 S.Ct. at 295. With

respect to a violation of equal rights under Title I, 29 U.S.C. § 411(a)(1), the touchstone of a valid Title I cause of action is discriminatory application of eligibility rules, *id.* at 139, 85 S.Ct. at 295; *Kupau v. Yamamoto*, 622 F.2d at 453–54; *McNail v. Amalgamated Meat Cutters, AFL–CIO*, 549 F.2d at 540; *Depew v. Edmiston*, 386 F.2d at 714. In this case, appellees alleged several violations of equal rights protected by Title I, but the district court found that only two violations were likely to have been committed: the exclusion of members from the nomination meeting for failure to show TITAN receipts and the refusal to include Lynch as a candidate for secretary-treasurer. The facts alleged in the complaint show that appellees objected to applications of union rules against particular members; appellees did not object to the rules themselves. We accordingly hold that the allegations of these probable violations presented sufficient equal-rights causes of action, and we defer consideration of the evidentiary basis of the district court's findings until we review the preliminary injunction.

■ A similar cause-of-action analysis is applied to complaints charging violations of free speech rights protected by Title I, 29 U.S.C. § 411(a)(2). The distinction between attacks on rules themselves and attacks on discriminatory application of them that is used to analyze purported § 411(a)(1) claims does not, however, have a convenient parallel in a distinction between challenges to eligibility rules and challenges to applications of those rules that impede free speech. The rule that has been developed as to § 411(a)(2) claims is that where an election or election rules are involved, a court will have jurisdiction only "where union action abridging both Title I and Title IV can be fairly said, as a result of established union history or articulated policy, to be part of a purposeful and deliberate attempt by union officials to suppress dissent within the union." *Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir. 1973). *Accord, Driscoll v. Operating Engineers, Local 139*, 484 F.2d 682, 686–88 (7th Cir. 1973), *cert. denied*, 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974). This

rule represents an attempt to reconcile the Title IV policy that the Secretary first investigate election disputes with the Title I policy that federal courts protect the democratic spirit in union elections and elsewhere. *Schonfeld v. Penza,* 477 F.2d at 903–04.

Examining the allegations that underlie the free speech violations found by the district court, we conclude that plaintiffs sufficiently alleged that the application of the TITAN receipt requirement and the failure to include Lynch on the proper candidate list represented deliberate and purposeful attempts to suppress dissent. It was and is still up to plaintiffs, of course, to prove their allegations, a matter we discuss below.

The second question, whether the election was "already conducted," is raised in the Secretary's brief in the challenge to the district court's TRO, which was issued to prevent the counting of ballots and thus to prevent the election from becoming "already conducted." According to the Secretary, it was already too late; the district court had already lost its jurisdiction. An election cannot be said to begin until ballots are distributed, nor can it be completed until the results are announced, but § 483 does not make clear how the period between ballot distribution and announcement of results should be classified. The instant case involves this uncertain period: ballots for the by-mail election had been sent out, some had been returned, and none had been counted.

The Secretary argues that the balloting process is part of the conduct of an election and that therefore other rights and remedies are available only before ballots are sent out. The Secretary points out that this result conforms to other provisions of Title IV, which empower the Secretary to supervise elections, and that it avoids a "race to the courthouse" that would occur if

losing candidates could seek judicial relief after they learn of the results but before the results are officially announced. (Appellants address this point in a footnote, contending simply that the election in the instant case was "already conducted.") Appellees argue that an election is not "already conducted" until ballots are counted, or at least that an election is not "already conducted" when, in a case such as this one, ballots have been sent out, some have been returned, and none have been counted.[15]

The legislative history on this point is unclear. S. 1555, which did not contain an exclusivity clause in its equivalent to Title IV, nevertheless apparently contemplated such a provision, but the explanation of the exclusiveness of the remedy at the time the Senate debated S. 1555 did not fix precisely the point when the federal remedy became exclusive. Senator Kennedy offered the explanation that "[p]rior to the day of an election an individual can sue a State. The day after an election the Secretary of Labor assumes jurisdiction." 105 Cong.Rec. 6485 (1959). What is meant to happen the day *of* an election, essentially the problem here, is unsaid. *See also* S.Rep.No.187 at 2338; H.Rep.No.741 at 2440. Moreover, at the time Senator Kennedy spoke, the bill did not contain a "bill of rights," and one cannot tell what effect, if any, the "bill of rights" would have been thought to have on this aspect of the future Title IV. The legislative history bearing generally on Titles I and IV, discussed above, supplies some greater assistance. Both houses of Congress displayed extensive support for individual rights protections that were written into Title I. Enforcement of these rights by the Secretary was rejected, some concern being voiced about the intrusiveness of that manner of enforcement. "Already conducted" should not be interpreted, therefore, so as to render Title I subordinate to Title IV.

15. Resolution of these arguments involves a secondary question: in deciding whether an election has occurred, should the court look at the time of the alleged violation or at the point in the electoral process where a remedy would be ordered? For purposes of this discussion only we will adopt the Secretary's position on this matter, that the time of the remedy is crucial.

The cases are not in accord, but the most extended treatment of the issue by one court appears in three opinions by the Third Circuit Court of Appeals. In one, the case to which the Secretary and appellants direct us principally, the court laid down the rule that "an election has been conducted once balloting has occurred." *McDonough v. Local 825, Int'l Union of Operating Engineers*, 470 F.2d 261, at 264 (3rd Cir. 1972). In that case, ballots had been returned and counted, the results were known, and the only thing left to be done was to certify the results. *Id. McDonough* thus does not provide a very reliable interpretation of "already conducted," a point borne out by its failure to discuss the earlier opinion in *Depew v. Edmiston*, 386 F.2d at 712, which allowed a Title I challenge to an election in which ballots had already been sent out. *Depew*, however, did not address the relationship of the mailing to § 483. The ambiguity of these rulings appears to have been resolved in the third case, *Amalgamated Clothing Workers Rank & File Comm. v. Amalgamated Clothing Workers, Philadelphia, Joint Board*, 473 F.2d 1303 (3d Cir. 1973), which stated that "*once the election has been completed*, the outcome cannot be affected by [a] Title I suit." *Id.* at 1306 (emphasis added). It cited *McDonough* in support of this proposition.[16] Other courts have also concluded that an election is not "already conducted" until it is completed, that is, until the ballots are counted and the results are known. *See Beckman v. Local No. 46, Int'l Ass'n of Bridge Workers*, 314 F.2d 848, 850 (7th Cir. 1963) (approving district court's ruling that Title I would be defeated if plaintiff in ballot-tampering case had to wait until ballots were counted and then pursue remedy under Title IV; no specific discussion of § 483); *Kolmonen v. International Hod Carriers Union*, 215 F.Supp. 703, 709 (W.D.Mich.1963) (Title I remedy available if challenge occurs "before a completed election"); *cf. Kupau v. Yamamoto*, 622 F.2d at 455–57 (Title I remedy available even after completed election if Title I claim does not ripen until that time).

Contrary statements, apart from the apparently superseded *McDonough* opinion, come from the district courts.[17] In *Laski v. International Organization of Masters*, 502 F.Supp. 134, 135–36 (S.D.N.Y.1980), the district court held that the mailing of ballots rendered the election "already conducted." The court relied on *McDonough* and the policy behind Title IV that federal courts not disrupt union elections. *Id.* (The district court also ruled alternatively that no Title I claim had been stated). The same rule was announced by a different judge of the same court, this time in reliance entirely on *McDonough*. *New Action Coalition v. Local 2, United Federation of Teachers*, 510 F.Supp. 1208, 1211–12 (S.D.N.Y.1981); *see also Lawrence v. Utility Workers Local 126*, 509 F.Supp. 1151, 1158 (N.D.Ohio 1981) (dictum) (quoting *McDonough* ).

The phrase "already conducted" is, as the foregoing shows, not free from ambiguity, but it seems to make most sense as "previously carried out." Considering the stages of an election—the last being the tabulation of votes—it is hard to conceive of an election as "already conducted" before the final stage has been completed; union mem-

---

**16.** The position of the Second Circuit is difficult to assess. Initially, it suggested a similar rule—plaintiff complaining about election practices "subsequent to the nomination and voting" must look to Title IV for relief, *Libutti v. DiBrizzi*, 337 F.2d 216, 218 (2d Cir. 1964)—but its vitality may be suspect, *see Libutti v. DiBrizzi*, 343 F.2d 460, 461 (2d Cir. 1965), aff'g on rehearing *Libutti v. DiBrizzi*, 337 F.2d 216 (*Calhoon* "casts considerable doubt" on interpretation of Title I in earlier opinion). The district courts have moved further away from this rule. *See New Action Coalition v. Local 2, United Federation of Teachers*, 510 F.Supp. 1208, 1211–12 (S.D.N.Y.1981) (election "already conducted" once ballots mailed out); *Laski v. International Organization of Masters*, 502 F.Supp. 134, 135–36 (S.D.N.Y.1980) (same).

**17.** Courts of appeals have dismissed Title I claims because elections have already occurred, but in these cases the results of the election have been known, and the election has been over. *Davis v. Turner*, 395 F.2d 671, 672 (9th Cir. 1968); *cf. Kempthorne v. United Transp. Union*, 457 F.2d 551, 553 (7th Cir. 1972) (per curiam) (completed election mooted claim).

bers—the class of potential Title I plaintiffs—would not think that an election was "already conducted" when they had received their ballots but not yet voted.

In addition to the language of § 483, the policies behind Titles I and IV favor a construction of "already conducted" that an election has not reached that point until the ballots have been counted. First, the need for effective relief requires that Title I remedies be available for violations that occur during the election process. Relief for violations under Title IV is possible only if the wrong "may have affected the outcome of an election," 29 U.S.C. § 482(c)(2); see 29 C.F.R. § 452.5. This test is mathematical: the Secretary of Labor will litigate under Title IV only if the number of affected ballots would have changed the outcome of the election. Comment, Union Elections and the LMRDA: Thirteen Years of Use and Abuse, 81 Yale L.J. 407, 498–99 (1972). The result is obvious: flagrant violations may go unremedied if the number of affected ballots is too small. For example, foreclosure of Title I claims once balloting begins would prevent effective relief for violations that occur during the election, such as denial of access to the polling place or failure to provide a minority with ballots, Note, Election Remedies Under the Labor-Management Reporting and Disclosure Act, 78 Harv.L.Rev. 1617, 1628 (1965). Moreover, some violations are not susceptible to this mathematical test, and there appears to be little guidance for the Secretary in determining whether to sue in these instances. Comment, supra, 81 Yale L.J. at 499.

Second, evaluation of the impact Title I may have on Title IV's policy of noninterference in union elections suggests that "already conducted" means that the ballots have been counted. Preresult judicial relief need not require a new election in all cases: the remedy necessary for discrimination against a few voters may be simply the opportunity for those voters to vote anew. Such a remedy is more flexible and potentially less disruptive than a new election, the only remedy that is possible under Title IV. Preresult judicial relief possesses other advantages over Title IV, all of which minimize the harmful effect government intervention may have on union affairs. Resolution of a dispute before the results of the election are known will prevent the dispute from casting doubt on the election. It will also prevent illegitimate victors from consolidating their positions and will help provide a fair and honest election in the first instance. Note, supra, 78 Harv.L.Rev. at 1623–24. Preresult Title I suits admittedly can be used to harass unions and to delay elections,[18] see id. at 1624, but the capacity of these suits to vindicate individual rights far outweighs these disadvantages, which may be protected against by the court in the same way that it handles other frivolous claims.

Finally, "already conducted" should mean "already completed" because one of the strongest reasons against Title I suits by individual union members does not come into being until the ballots have been counted. This reason is that union members should not be allowed to sandbag elections, that is, they should not wait to see whether they won or lost an arguably improperly held election before bringing suit. This is the "race to the courthouse" about which the Secretary is concerned. Up until the time ballots are opened and counted, there can be no sandbagging.

■ We rule, therefore, that an election is not "already conducted" until all the ballots are counted and find that the election in this case was not "already conducted."[19] We are cognizant of the Secretary's argu-

---

**18.** One other argument against these suits, that an aggrieved party may win thereby mooting his claim, is not applicable in a case such as this, where one plaintiff is denied the right to be listed in the correct group of candidates.

**19.** This holding makes it unnecessary to consider whether the Ninth Circuit's ruling in Ku-

pau v. Yamamoto, 622 F.2d 449, 456 (9th Cir. 1980), that a court may have jurisdiction to order a new election even after the first election is already completed—if the Title I claim also accrues after that time—is also the law here.

ments that foreclosure of Title I suits at an earlier point will better enable the Secretary to centralize and screen suits, will exploit the Secretary's expertise, and will further union self-government. We believe that these arguments have largely been answered above, but we emphasize two points in addition. First, these policies are to be considered in view of the entire scope of Title IV, which reaches several areas not addressed in Title I, and these policies are consequently not much affected whether Title I suits are allowed before or after ballots are mailed. Second, whatever the effects may be, we are persuaded that the legislative history of Title I shows that Congress intended full enforcement of Title I rights, and that the importance of these rights overrides the effects that the suits we permit here will have on Title IV.

## II. *The Preliminary Injunction*

■ In addition to their jurisdictional attack, appellants also challenge the propriety of the preliminary injunction issued by the district court. On appeal of a preliminary injunction, the district court will be upheld unless it abused its discretion or applied improper legal or equitable standards. *Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir. 1981). The district court itself must make four findings in order to issue a preliminary injunction: the plaintiff will be likely to succeed on the merits of his claim, he will suffer irreparable harm if the injunction is not granted, issuance of the injunction will not cause more harm to the defendant than failure to issue would cause the plaintiff, and the public interest favors the injunction. *Id.* Appellants make essentially five arguments in contesting the findings made by the district court. First, the district court improperly found that plaintiffs were likely to succeed on the merits of two of their claims. Second, the injunction violated the traditional rule of equity that preliminary injunctions exist only to preserve the status quo. Third, the preliminary injunction granted effectively all the relief sought by plaintiffs, something a preliminary injunction should not do. Fourth, the

terms of the injunction—prescribing in detail new nomination and election procedures—go well beyond remedying the probable violations found by the district court—defects in only the nominating process—and preventing harm to plaintiffs. Finally, the "stipulations" proposed by appellants for a new election—the apparent reason the injunction covered the election as well as the nomination process—did not justify the district court in so enlarging the injunction. With respect to appellants' final four arguments, we note that appellants appear to argue mainly that *any* injunction requiring a new nomination meeting and election would be invalid; as appears in the discussion below, some of the specific terms of the injunction are not offensive to appellants. We nevertheless do discuss some of the specific terms as well.

■ As to the evidence underlying the district court's conclusion that plaintiffs enjoyed a likelihood of success on two claims, we will affirm the findings unless the district court committed clear error. Fed.R.Civ.P. 52(a). The two factual events in which the district court found probable Title I violations were the exclusion of members from the nomination meeting for failure to show TITAN receipts and the refusal to include Lynch as a candidate for secretary-treasurer. Each event was said to violate both the equal rights and free speech provisions of Title I. Review of the record convinces us that these events were properly found likely to be incidents of discrimination and repression directed against certain dissident members in violation of Title I, not application of unreasonable rules to members generally in violation of Title IV. Plaintiffs introduced evidence showing that they represented an identifiable group of dissidents, that the TITAN receipt rule had not been implemented until the nomination meeting when dissident members were expected to appear, and that Lynch's nomination was incorrectly recorded as one for president, the only possible explanation for which was discrimination on the part of the incumbent, the only other candidate for secretary-treasurer. This evi-

dence was sufficient to enable the district court to find that equal rights had probably been denied and that a purposeful attempt had probably been made to suppress dissent.

Admittedly, with respect to Lynch's nomination, Lynch himself testified that he was nominated for president. Appellants argue that this testimony and the "adverse inference" rule, International Union, UAW v. NLRB, 459 F.2d 1329, 1335–39 (D.C.Cir. 1972) (litigant's failure to produce relevant evidence within its control warrants inference that evidence is adverse to litigant), required the conclusion that Lynch's nomination was correctly recorded as one for president. We disagree. Other witnesses testified that Lynch was nominated for secretary-treasurer, and since all these witnesses were present at the nomination meeting, the district court did not err in crediting their testimony over Lynch's. Nor was Lynch's testimony evidence exclusively in control of the plaintiffs who steadfastly refused to disclose it, as was the case in International Union. Finally, an adverse inference is generally discretionary, id. at 1339, so, even if one was proper in this case, the district court did not err in reaching a contrary factual conclusion. Appellants also offered other evidence tending to show that uniform rules were merely applied to the plaintiffs, but the district court's conclusion that plaintiffs' evidence was weightier was not clearly erroneous. We hold that the district court committed no clear error in finding that plaintiffs were likely to show that defendants' conduct in two instances violated the equal rights and free speech provisions of Title I.

Appellants' two most troubling arguments rest on two traditional precepts of equity jurisprudence: a preliminary injunction shall not alter the status quo, and it shall not grant the ultimate relief sought. These two doctrines are not entirely distinct, see H. McClintock, Handbook of the Principles of Equity § 15, at 33 (2d ed. 1948) (courts reluctant to issue mandatory preliminary injunctions because purpose of preliminary injunction is to preserve status quo); Leubsdorf, The Standard for Preliminary Injunctions, 91 Harv.L.Rev. 525, 534–35 (1978) (discussing connection in nineteenth century between status quo doctrine and reluctance of courts "to decree burdensome relief without a full hearing"), although the second is more clearly reflected in the federal rules, see Fed.R.Civ.P. 65(a)(2) (requirements for consolidation of trial on merits with request for preliminary relief).

The traditional function of the preliminary injunction is to preserve the status quo, e.g., American Hospital Ass'n v. Harris, 625 F.2d 1328, 1330 (7th Cir. 1980); Diversified Mortg. Investors v. United States Life Title Ins. Co., 544 F.2d 571, 576 (2d Cir. 1976); Morgan v. Fletcher, 518 F.2d 236, 239 (5th Cir. 1975), so that the court may retain its ability to render a meaningful decision on the merits, Canal Authority v. Callaway, 489 F.2d 567, 573 (5th Cir. 1974). The status quo is the "last uncontested status which preceded the pending controversy," Westinghouse Elec. Corp. v. Free Sewing Machine Co., 256 F.2d 806, 808 (7th Cir. 1958). Application of this doctrine is discretionary with the court, see H. McClintock, supra, § 15, at 33, however, and it cannot be mechanically applied. National Ass'n of Letter Carriers v. Sombrotto, 449 F.2d 915, 921 (2d Cir. 1971). The status quo in the instant case is the Local with its elective positions filled as they were before the nomination meeting and election. This situation works a continuing, irreparable harm to plaintiffs, though, because it allows individual defendants to achieve the purpose of their likely violations of plaintiffs' rights, to maintain themselves in office.[20]

If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status

---

20. In view of the Local's probable violations, it cannot be supposed that invalidation of the results of the previous nominations and elec- tion would be enough, on the theory that the Local would now conduct a proper nomination meeting and election on its own.

quo between the parties, ... by the issuance of a mandatory injunction, ... or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury. The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.

*Canal Authority v. Callaway,* 489 F.2d at 576 (dictum). The district court faced a similar task: it had to pronounce such relief as would be agreeable to both parties and, if that was impossible, such relief as would prevent harm to plaintiffs without impinging unduly on defendants.

We turn, then, to a review of the shaping of the preliminary injunction.[21] On January 9, 1981, defendants filed proposed "stipulations"[22] with the district court as part of an offer to hold a new nomination meeting and election. The stipulations were substantially reflected in the preliminary injunction finally issued, paragraphs 3, 4, 5(a), 5(c), 5(d), 5(e), 5(f)(i), 5(f)(ii), 5(f)(iii), 5(g), 5(h), 5(j), 5(k), 5(*l*), and 5(m), see 521 F.Supp. at 636–38. The stipulations varied from the injunctions, however, in that the Local proposed that its supervisory body, Teamsters Joint Council 10, oversee the election (compare paragraphs 3, 5(j)), in that the Local also suggested that combined notice of nominations and election be mailed only twenty days beforehand (compare paragraph 4), and in that the district court modified the Local's suggested requirement of timely dues payments for candidates by discussing when payments were considered received and by excusing late payments of increases in dues (compare paragraph 5(f)(i)). Shortly thereafter, defendants proposed supplemental stipulations, one of which was incorporated in paragraph 5(e) of the preliminary order, and one of which was included as paragraph 5(f)(iv).

The district court on February 12, 1981, issued a proposed order that contained most of defendants' stipulations. In addition, the proposed order left open the identity of the supervisor of the nomination and election, provided that this unnamed supervisor would on request review the eligibility of members to be candidates, set out in greater detail the eligibility requirements for candidates, which included a grace period for late payment of dues increases that was not included in defendants' stipulations, declared the previous nominations and election null and void, and contained what in substance became paragraphs 5(b), 6, 7, 8, 9, and 10 of the preliminary injunction. Joint Council 10, defendants' choice as arbitrator, refused to supervise an election pursuant to any court order. Defendants, continuing to object to the district court's jurisdiction to issue an order and to the need for an order, also objected to the grace period for late payment of dues increases, the eligibility determinations by the arbitrator of the election because it usurped the union's internal procedures, and the injunction against defendants from violating the rights of members protected under 29 U.S.C. § 411. Meanwhile, the court continued to hold hearings, and both parties made further efforts to produce an acceptable order.

Plaintiffs on April 8, 1981, suggested some modifications to the proposed order, most notably provisions that Lawrence Katz and the Honest Ballot Association (HBA) arbitrate the nominations and election, that procedures for eligibility determinations to be made by the arbitrator be explained in greater detail, and that the Local pay the fees and costs of supervision and arbitration of the nomination meeting and election. Defendants objected, although not to the appointment of Katz and the HBA, but on April 21 these modifications were incorporated in a second proposed order. The only other significant additions in this order, in comparison to the first, were that disputes over candidate eli-

---

**21.** The injunction is reproduced as an appendix.

**22.** Although we continue use of appellants' term "stipulations," these were not true factual stipulations narrowing the factual dispute but offers of settlement to which appellants agreed to be bound, if appellees so agreed.

gibility arising out of failure to pay dues increases were to be arbitrated and that the combined notice of nominations and election was to be mailed forty days beforehand.

This order apparently had its hoped-for effect: the parties together then offered further modifications. They agreed to the forty-day notice. They also suggested a precatory paragraph regarding verification of eligibility (now paragraph 5(f)(v) of the preliminary injunction), procedures for determining the eligibility of nominators, seconders, and candidates (now substantially paragraph 5(i)), a modification of the Local's liability for fees and expenses of the arbitrators (now paragraph 12), and omission of the second proposed order's provision for arbitration of candidate eligibility disputes involving failure to pay dues increases. The preliminary injunction followed on July 13, its only additional provision (the parties' joint suggestions having been accepted) being that plaintiffs were not required to post security.

This history persuades us that the district court constructed a preliminary injunction that effected as little change as possible from terms which defendants found acceptable where the status quo caused continuing harm to plaintiffs. The best course in such a case is for the parties to agree on a preliminary order, and many of the provisions of the injunction were included at the request of or with the agreement of the defendants, the objecting party here. Indeed, defendants appear to object specifically—we address elsewhere their general objection to any court-ordered election—only to two paragraphs of the injunction, 10 and 13, and to the parts of paragraph 5(f)(i) regarding the grace period for late payment of dues increases. They have not taken a position with respect to paragraphs 6, 7, and 8, but these paragraphs essentially repeat paragraphs 5(e), 5(f), and 5(*l*), respectively. Defendants' lack of objection to Katz and the HBA implies consent to paragraph 9. They otherwise agree to the terms of the injunction.

Defendants' objections to paragraphs 10 and 13 and part of 5(f)(i) are without merit

in terms of the status quo doctrine. Paragraph 10 is entirely in keeping with the status quo; given the district court's finding that defendants probably violated 29 U.S.C. § 411(a)(1), (2), the injunction is proper and does not require conduct different from that that preceded the controversies here. Paragraph 13 is discussed below. This leaves the grace period for late payment of dues increases. Part of the case before the district court but not before us on appeal (other than here) was an attack by plaintiffs on dues increases by the Local. The district court rejected defendants' motion to dismiss this claim, 521 F.Supp. at 630–32, but also found that plaintiffs had not shown any likelihood of success that would entitle them to preliminary relief on this claim, *id.* at 632–34. The merits of the claim have still to be decided. The grace period provision, requiring payment of the challenged dues increases but allowing them to be late, compromises the claim for purposes of the nomination and election. It thereby maintains as much as possible the status quo of the dues dispute, as well as of the Title I aspect of the case.

As a practical matter, the status quo requirement is not really applicable here. The nomination meeting was rigged; maintaining the status quo would do irreparable harm to plaintiffs. A supervised nomination meeting and election was the only relief possible. The district court sought admirably to construct an injunction with as few provisions as possible offensive to defendants.

■ The status quo doctrine also serves a common purpose with the doctrine that a preliminary injunction not grant the ultimate relief sought, the basis of appellants' third argument. This purpose is that relief requiring parties to change their conduct not issue until all parties, especially those to be enjoined, have had an opportunity to present their cases on the merits. The accepted doctrine is that a mandatory injunction—the equivalent of the "ultimate relief" the appellants complain about here—shall not issue before a final hearing. H. McClintock, *supra*, § 15, at 33. *See Miami*

*Beach Fed. Sav. & Loan Ass'n v. Callander,* 256 F.2d 410, 415 (5th Cir. 1958) (mandatory injunction shall not issue unless facts and law are clearly in favor of applicant). At the heart of this reluctance to issue ultimate or mandatory preliminary relief is the concern that a defendant have notice of a claim against it and an opportunity to respond. *See Marshall Durbin Farms, Inc. v. National Farmers Organization, Inc.,* 446 F.2d 353, 356 (5th Cir. 1971) (Rule 65(a) requires notice and hearing). It would plainly be unfair and inequitable for a defendant to be enjoined in his conduct on the basis of a claim he has not had a full opportunity to respond to. This concern with due process is reflected in Fed.R.Civ.P. 65(a).[23] Under Fed.R.Civ.P. 65(a)(2), if an order granted after preliminary proceedings is characterized as final, then it is arguably invalid for the court's failure to give notice of consolidation. In the instant case, the district court did not label the injunction as final and apparently did not regard it as the final order in this case. Because compliance with the injunction—holding a new nomination meeting and election—will give plaintiffs nearly all the relief they seek, the preliminary injunction here should be subject to relatively strict notice and hearing standards.

■ The history of the development of the preliminary injunction in this case—reviewed above in the discussion of the status quo—reveals that the shaping of the injunction was attended with proper notice and hearing. Without repeating that history, we believe the record shows that defendants helped initiate the injunction in its present form, that the two proposed orders gave defendants ample notice of the injunc-

tion's proposed terms, and that defendants had opportunity over several months to present contrary arguments and evidence. Defendants also had sufficient notice of plaintiffs' claims and opportunity to controvert them, as shown by their presentation of evidence on liability in March, 1981, several weeks after development of the preliminary injunction had begun.

■ With regard to appellants' fourth claim, that the injunction goes well beyond the violations found by the district court, we note first that the district court enjoys great discretion in framing preliminary injunctive relief because it must draft an order sensitive to the facts of the case. *See Continental Group, Inc. v. Amoco Chemicals Corp.,* 614 F.2d 351, 357 (3d Cir. 1980) (district court has discretion in performing "delicate balancing" required in preliminary proceeding). We observe as well that the probable violations concerned not merely the nomination meeting but also the election because the listing of a nominee among the wrong candidates tainted the election. Accordingly, a preliminary injunction in this case could order a new, supervised nomination meeting and election. As to the particulars of the injunction, as found above, the defendants had suggested or agreed to most of the provisions of the injunction. Most of these provisions cover procedural aspects of the nominations and election, and we believe the district court acted within its discretion in outlining the procedures in accordance with the suggestions of the defendants. Perhaps the most intrusive element of the injunction is the provision for arbitration of eligibility disputes. Defendants initially objected to such a provision, but they later "stipulated"

---

**23.** Fed.R.Civ.P. 65(a) provides in relevant part as follows:

(1) *Notice.* No preliminary injunction shall be issued without notice to the adverse party.

(2) *Consolidation of Hearing With Trial on Merits.* Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application.

We note that, although a preliminary injunction is subject to a broad notice-and-hearing test, a final injunction may be issued from what was originally only a preliminary proceeding only when the court specifically advises the parties that the preliminary proceeding is being combined with the trial on the merits. *Penn v. San Juan Hospital, Inc.* 528 F.2d 1181, 1186–87 (10th Cir. 1975). In the instant case, the district court suggested consolidation, the appellants objected, and the matter was not further pursued.

with the plaintiffs for an arbitration procedure that appears in almost identical form in the injunction, so we do not think that the arbitration can be termed excessive. As to still objected-to portions of the injunction, paragraph 10 enjoins defendants from committing violations they were found likely to have committed before and is not excessive, and the grace period provisions of paragraph 5(f)(i) are equally inoffensive because they amount to a temporary compromise of a related and unsettled dispute. Paragraph 13 is discussed below. We conclude that none of the specific provisions of the preliminary injunction are excessive.

The conclusion that the injunction did not exceed the remedy required for the violations found likely to exist renders largely unnecessary a discussion of appellants' final argument, that their stipulations did not justify so extensive an injunction. We emphasize, however, that we do not uphold the injunction on the theory that defendants were bound by their stipulations. Rather, we believe that it was within the district court's discretion to take the stipulations into account as indications of defendants' preferences and possible future conduct, facts that would affect the quality of relief ordered. The district court could properly conclude that a new nomination meeting and election were required, and in making the appropriate order it was entitled to consider the apparent desires of the parties. Appellants also suggest that their stipulations amounted at most to consent to subject-matter jurisdiction, an invalid basis for jurisdiction, but the district court based jurisdiction on the alleged violations, not on the stipulations.

III. *The Bond Requirement*

Appellants' final contention is that the district court erred in not requiring plaintiffs to post bond as required under Fed.R. Civ.P. 65(c).[24] The district court found the matter of a bond requirement to be within its discretion and to depend on its evaluation of four factors: the possible harm to the enjoined party if the order is unlawful, the likelihood of applicant's success on the merits, applicant's ability to post a substantial bond or surety, and the possible adverse impact that requiring substantial security might have on the enforcement of rights created by remedial legislation. A similar test was applied in *Natural Resources Defense Council, Inc. v. Morton*, 337 F.Supp. 167, 168–69 (D.D.C.1971), *aff'd on other grounds*, 458 F.2d 827 (D.C.Cir.1972), a case on which the district court relied in part. Applying these factors, the district court observed that the policy of the LMRDA was to encourage union members' suits to vindicate union democracy and that a bond requirement would affect such enforcement adversely. It also found that plaintiffs had shown a substantial likelihood of success on the merits. The district court paid less attention to the harm defendants would suffer if the order was invalid, but it did comment that until this point all the defendants had used union funds to meet their legal expenses. As to plaintiffs' ability to post bond, the district court stated that having to post it "would impose a severe financial hardship upon them."

"[T]he conclusion seems inescapable that once the court decides to grant equitable relief under Rule 65 it must require security from the applicant." 11 Wright & Miller, Federal Practice & Procedure § 2954, at 524. The amount of required security is "in such sum as the court deems proper," Fed. R.Civ.P. 65(c), which has led some courts to conclude that the requirement is actually within the district court's discretion. *See Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978) (per curiam); *Urbain v. Knapp Bros. Mfg. Co.*, 217 F.2d 810, 815–16 (6th Cir. 1954), *cert. denied*, 349 U.S. 930, 75 S.Ct. 772, 99 L.Ed.

---

**24.** Fed.R.Civ.P. 65(c) provides in relevant part as follows:

(c) *Security.* No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

1260 (1955). Whether bond is required subject to exceptions or is discretionary, Rule 65(c) has spawned essentially two lines of cases that, taken together, illuminate the considerations relevant to the bond requirement. In the first, a bond is required where the injunction exposes the defendant to a risk of monetary loss. *System Operations, Inc. v. Scientific Games Development Corp.*, 555 F.2d 1131, 1145–46 (3d Cir. 1977); *see Reinders Bros. v. Rain Bird Eastern Sales Corp.*, 627 F.2d 44, 54 (7th Cir. 1980); *International Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir.), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974). The nature of monetary loss is not fully explained: these cases all involve commercial or financial transactions. These cases are also in some conflict as to the effect of failure to require a bond. Failure has constituted reversible error, but only as an alternative ground. *System Operations, Inc. v. Scientific Games Development Corp.*, 555 F.2d at 1145–46; *Telex Corp. v. IBM*, 464 F.2d 1025, 1025–26 (8th Cir. 1972) (per curiam). Where the injunction is otherwise upheld, the case has been remanded solely for reconsideration of the bond requirement. *Reinders Bros. v. Rain Bird Eastern Sales Corp.*, 627 F.2d at 54. In the second line, no bond is required in suits to enforce important federal rights or "public interests." *Bartels v. Biernat*, 405 F.Supp. 1012, 1019 (E.D.Wis.1975); *Bass v. Richardson*, 338 F.Supp. 478, 491 (S.D.N.Y.1971); *Natural Resources Defense Council, Inc. v. Morton*, 337 F.Supp. 167, 168–69; 11 C. Wright & A. Miller, *supra*, § 2954, at 528–31. The rights prosecuted in these cases arose out of comprehensive federal health and welfare statutes, and this may distinguish them by "importance" from other federal statutory rights. Moreover, some of these cases involved indigent plaintiffs, from whom it would be unjust to require security. *See Bartels v. Biernat*, 405 F.Supp. at 1019; *Bass v. Richardson*, 338 F.Supp. at 491; 11 C. Wright & A. Miller, *supra*, § 2954, at 528.

 These cases suggest to us that a district court should take into account the following factors in deciding whether to require a bond. First, at least in noncommercial cases, the court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant. Applicants in commercial cases—merchants, manufacturers, and others—can be assumed capable of bearing most bond requirements, so hardship to them is less of a factor. Second, in order not to restrict a federal right unduly, the impact that a bond requirement would have on enforcement of the right should also be considered. One measure of the impact lies in a comparison of the positions of the applicant and the enjoined party. A bond requirement would have a greater adverse effect where the applicant is an individual and the enjoined party an institution that otherwise has some control over the applicant than where both parties are individuals or institutions.

 Three of the factors that the district court applied—burden of compliance on defendants, plaintiffs' ability to pay, and impact on plaintiffs' rights—reflected these considerations; the likelihood-of-success factor did not. This last is already adequately accounted for in the decision whether to grant preliminary relief at all and generally seems to be irrelevant to the issue of a bond requirement.[25]

 The district court generally made the appropriate inquiries in determining whether to require security, and, we believe, it also reached appropriate factual conclusions that militated against a bond. No great burden will be imposed on appellants, even in the absence of security, particularly because the institutional appellant, the Local, whose contributing members include plaintiffs, will bear the costs of compliance. Plaintiffs, by contrast, are certainly less able to afford security. Finally, a bond requirement would affect enforce-

---

**25.** In cases where the likelihood of success is extraordinarily high, this factor may be an additional reason not to require a bond. The instant action, however, is not such a case, and we have no occasion to address the scope of this sometime factor.

ment of Title I rights adversely because individual union members are at a great financial disadvantage in litigating against unions. The plaintiffs' likelihood of success is irrelevant here, but because it, too, cuts against a bond requirement, it is not necessary to remand the question to the district court to weigh only the three other factors. The district court acted within its discretion in not requiring a bond.

*The order of the district court is affirmed.*

## APPENDIX

### July 13, 1981

### PRELIMINARY INJUNCTION

For the reasons stated in the accompanying Memorandum, it is hereby ORDERED and DECLARED that:

1. The order entered by the court on December 12, 1980 is modified as set forth below.

2. The nominations received at the November 9, 1980 meeting of defendant Local 82, and the election originally scheduled to be completed on December 13, 1980, are legally without effect pending further order of this court. The ballots from that election shall remain in the custody of an officer of this court.

3. Local 82 shall provide for a nomination meeting and mail ballot election for the officers of Local 82, to be supervised and conducted by Lawrence Katz, Esquire, in conjunction with the Honest Ballot Association of New England ("the Arbitrators") in accordance with paragraph 9 of this order. The nomination meeting shall be held within 80 days of the entry of this order. Subject to applicable law and this order, the nomination meeting and election shall be conducted in accordance with the Constitution and By-laws of Local 82, and the Constitution of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

4. Under the supervision of the Arbitrators, Local 82 shall mail each member a combined notice of the nomination meeting and election at his last known home address at least 40 days before the date of the nomination meeting, and, in addition, shall mail notices for posting at least 40 days before the date of the nomination meeting to the stewards or, if there is no steward, to the employer, at the facilities of all employers that have collective bargaining agreements with Local 82.

5. The combined notice of nomination and election will contain the following information:

(a) The date, time and place of the nomination meeting.

(b) A declaration that:

The purpose of this meeting will be the nomination of officers for Local 82. After hearings in the Federal District Court, the incumbent officers of Local 82 have offered to have, and the court has ordered, a new election, which will be conducted by a third party in order to assure that the nominations and election are conducted in a fair and orderly fashion.

(c) The list of offices to be filled: President and Business-Agent, Vice-President, Secretary-Treasurer and Business-Agent, Recording Secretary, and three Trustees, all of whom together constitute the Executive Board.

(d) The officers elected in the upcoming election will complete the term of office which commenced on January 1, 1981 and which will expire on December 31, 1983.

(e) The eligibility requirements for members to attend the nominations meeting: Every member whose dues are paid up through the month before the month in which the nomination meeting is conducted has the right to attend the nomination meeting. Members may be admitted to the nomination meeting upon presentation of a TITAN computer receipt showing payment through the prior month or upon presentation of a TITAN receipt supplemented by payment at the door or payment evidenced by a temporary receipt, which TITAN receipt and other evidence taken together verify payment of dues through the prior month. Local Union officers, or their des-

ignated agents, shall receive dues payments at the door and shall issue temporary dues receipts therefor.

(f) The eligibility requirements to run for office:

(i) Every member in good standing, by the payment of his dues on or before the last business day of the current month, in accordance with the International Constitution, who has been in such continuous good standing for each consecutive month in the twenty-four (24) month period immediately prior to nominations, shall be eligible to hold office if otherwise qualified under the International Constitution, Local By-Laws and applicable law. Dues are considered to have been received by the Local Union when they are in the physical possession of the Union or its authorized agent. Thus, dues paid by mail are received when the dues are delivered to the Union; dues paid in person at the Union hall are received at the time tendered; and dues paid to a steward, business agent, or other authorized collection agent are received when paid to the agent. Payment of dues after their due date does not restore good standing status for such month in computing the continuous 24 month good standing status as a condition of eligibility for office. However, a member who has made an incorrect dues payment in any month in which the rate of dues has been changed shall be considered in good standing for the month(s) in question so long as he paid the difference in the rates of dues owed to the Local Union before the start of the nomination meeting scheduled under the order of this court.

(ii) A member otherwise qualified to run for office must be nominated at the nomination meeting by a member in good standing other than the nominee and seconded by a member in good standing other than the nominee. A member is entitled to nominate or second the nomination of only one candidate for each office.

(iii) The 50% meeting attendance eligibility requirement contained in Article VI of the Local Union By-Laws is waived for this nomination and election.

(iv) In order to be nominated for office, a member must either be present at the nomination meeting to accept the nomination or must have a signed statement indicating his acceptance of nomination for a particular office delivered to the presiding official at said meeting.

(v) Members intending to run for office are urged to verify their own eligibility as well as the eligibility of their potential nominators and seconders prior to the nominations meeting by making a request, in writing, to the Arbitrators. The Arbitrators shall render decisions concerning the eligibility of any candidate, nominator, or seconder, in accordance with the procedures set forth in paragraph 5(i) of this notice.

(g) The nomination and election rules are set forth in the Local By-Laws and International Constitution which are available for inspection at the Local 82 offices and may be purchased upon payment of $.50.

(h) All officers and business agents elected in the forthcoming election shall, by virtue of such election, be delegates to any International Convention which may take place during their term of office, and the officers elected in the forthcoming election shall be delegates to all Teamster subordinate bodies and all other conventions in accordance with the provisions of Article II, Section 4(f) and Article III, Section 5 of the International Constitution.

(i) Any member may request in writing that the Arbitrators review his eligibility to hold office, or to participate in the nominations meeting as a nominator or seconder at any time after the mailing of the notices of the nominations meeting and before the nominations meeting. The Arbitrators shall make a report on the eligibility of that member within seven days thereafter to any interested member. Any member may challenge the determination of the Arbitrators that a member is either eligible or not eligible to be a candidate for office, or be a nominator or seconder at the nominations meeting. Any challenge to a decision of

the Arbitrators must be made, in writing, within two days of the Arbitrators' decision and must set forth the ground on which the challenge is based. The Arbitrators shall hear the challenge and make a written determination within five days of receiving the challenge. Any member asserting that the Arbitrators' determination of the facts underlying his claim for eligibility is not supported by substantial evidence must file a request to set aside the Arbitrators' decision with the Arbitrators within five days of the decision, for transmittal to the court along with a report by the Arbitrators.

After the nominations meeting, the Arbitrators shall review the eligibility of any candidate whose eligibility had not previously been determined and shall make a determination of each such candidate's eligibility within 48 hours of the nominations meeting. If, following the nominations meeting, the Arbitrators determine that a candidate is ineligible, he shall notify the candidate by telephone within 48 hours of the nominations meeting and shall confirm this communication to the candidate in writing. In addition, the Arbitrators shall notify counsel for the plaintiffs and defendants by telephone of the eligibility determinations made following the nominations meeting, within 48 hours of the nominations meeting, and shall confirm this communication to counsel in writing. Challenges to the decisions of the Arbitrators concerning the eligibility of the nominees must be filed, in writing, with the Arbitrators within 48 hours of the Arbitrators' decision and must set forth the specific basis upon which the challenge is made. The Arbitrators shall hear the challenge and make a written determination within 7 days. Any member wishing to appeal the determination of the Arbitrators must file a request to set aside the Arbitrators' decision with the Arbitrators within 48 hours of the decision for transmittal to the court along with a report by the Arbitrators.

j. All arrangements for distribution of campaign literature shall be made by the Arbitrators consistently with the By-Laws, International Constitution and applicable law.

k. The election shall be conducted by mail ballot. The notice will specify the date ballots and other election materials and instructions will be mailed, the date and time ballots will be collected for counting, and the location of the ballot count. The notice will also specify the voting packets will be mailed to each member's last known home address at least 20 days before the counting of the ballots. The notice will describe the procedure to be followed to obtain a ballot if the member does not receive a ballot in the mail. If two ballots are received from the same member, both will be declared null and void and not counted.

l. A member's vote will be counted only if he has paid his dues through the month prior to the month in which the election is held. Members may pay their dues before the close of business at 5:00 p. m. on the day before the counting of the ballots.

m. Each candidate, at his own expense, shall have the right to have an observer other than himself present for the mailing of ballots, the removal of ballots from the post office, and the subsequent counting of the ballots.

6. All members meeting the eligibility criteria set forth in paragraph 5(e) shall be permitted to attend the nominations meeting.

7. All members meeting the eligibility criteria set forth in paragraph 5(f) shall be permitted to run for office.

8. All members meeting the eligibility criteria set forth in paragraph 5(l) shall be permitted to vote.

9. The Arbitrators seeking to supervise and conduct the nominations and election required by this order shall file an undertaking with the court indicating their consent to the terms and conditions of this order, and in addition, shall:

a. Provide for the designation of an official to answer inquiries and make reports on members' eligibility to hold office as set forth in paragraph 5(i).

b. Make all arrangements for distribution of campaign literature as set forth in paragraph 5(j) of this order.

c. Ensure that no member of the Arbitrators who participates in the supervision or conduct of the nomination and election required by this order shall have any interest in the outcome of the election.

10. Defendants Bart A. Griffiths, George Harris, and Local 82 are enjoined from violating the equal rights of members of Local 82, guaranteed by 29 U.S.C. § 411,

(a) to nominate candidates in the election to be conducted in accordance with this order, to vote in the election, to attend all meetings of Local 82 in which business related in any way to this election is conducted, and to participate in the deliberations and voting upon business of such meetings, subject to the rules and regulations of the constitution and bylaws of the union;

(b) to meet and assemble freely with other members and to express any views, arguments, or opinions relating to the nominations and election to be conducted in accordance with this order, and to express, at meetings of Local 82 in which business is conducted relating in any way to this election, any views upon candidates or upon any business properly before such meetings, subject to the rules and regulations established in this order and in the rules and regulations of the constitution and bylaws of the union.

11. This order shall remain in effect until further order of this court.

12. Local 82 shall pay the fees and expenses incurred by the Arbitrators in discharging their responsibilities under this order in the amount determined by the Court and shall advance to the Arbitrators the amounts necessary to cover the postage required to mail the notices and balloting materials necessitated by this order.

13. Plaintiffs are not required to post a security under Fed.R.Civ.P. 65(c).

Robert E. Keeton
United States District Judge

LEVIN H. CAMPBELL, Circuit Judge (dissenting).

I disagree with the court's interpretation of the statutory scheme. While I can appreciate the difficulty of discerning Congress's intent in this puzzling area, and while I understand why the district court felt that the union election in question was improper, I am unable to read Title I as extending so far as to allow a district court, once balloting has commenced, to invalidate an election and order a new one under its supervision and under terms and conditions extemporized by the court and parties.

I might feel differently if the problem arising in the original election were such as could be cured without setting aside the first election and without holding a new one. For example, if the matter at issue were whether to count certain ballots, it could be that an order to count, or not count, would be authorized under Title I, even though the voting had commenced and the election were in progress. But given the fact that Title IV provides certain procedures for rerun elections, in which the Secretary of Labor is given a special role, I think it unreasonable to derive from Title I the authority to order some other sort of rerun election, excluding the Secretary, in cases where the complaining party reaches the courthouse door before all the ballots are counted.

The resolution this court now adopts—based on a determination that until the ballots are counted the election is not "already conducted," and that sweeping judicial relief (to the point of ordering a brand-new election under whatever machinery suits the court) is appropriate—seems to me to be both unprecedented and beyond the contemplation of the statute. Congress, as previously noted, provided a special mechanism for holding rerun elections, with the Labor Secretary to administer the election under supervision of the court. The Supreme Court has said that the purpose of this mechanism is to minimize judicial intrusiveness into union elections and to utilize the Secretary's special expertise. In *Calhoon v. Harvey*, 379 U.S. 134, 140, 85

S.Ct. 292, 296, 13 L.Ed.2d 190 (1964), for example, the Court recognized the congressional intent "to utilize the special knowledge and discretion of the Secretary of Labor." *Calhoon's* emphasis on non-intrusiveness into union elections should be especially instructive for us here. *Wirtz v. Glass Bottle Blowers Association*, 389 U.S. 463, 470–71, 88 S.Ct. 643, 647–48, 19 L.Ed.2d 705 (1968), also speaks of "Title IV's special function" in safeguarding the election process; the Title IV enforcement method was described as a legislative compromise between this policy and that of avoiding undue intrusiveness. Again, this should caution us against opening the door to ordering new elections under court supervision under a different format than that authorized by the union's own rules. To say that rerun elections can be ordered without Title IV's special safeguards if only the final ballot has not been counted seems to me to trench heavily into the congressional design as construed by the Court.

The rule this court now establishes would allow relief under Title I (ordering and supervising a new election) which heretofore has existed only under Title IV. I believe that the proper accommodation between Title I and Title IV requires consideration not only of the stage which the election process has reached but the nature of the relief. If a new, supervised election is required, many concerns argue against finding Title I jurisdiction: intrusiveness, delay, disruption, and the court's lack of expertise in this area, especially as compared to the Secretary. Moreover, it makes little sense for there to be two potential rerun formats, the choice to depend on the fortuity whether the first election is invalidated before or after its completion. On the other hand, where no new election is required—for example, where only additional ballots have to be sent out—these concerns are not nearly so great. I therefore think that whether an election was "already conducted" should be determined, in part, by looking to the relief requested. This functional approach is suggested in a note in the Columbia Law Review, "Pre-Election Remedies Under the Landrum-Griffin Act," 74 Colum.L.Rev. 1105, 1124 (1974). Comments elsewhere also describe the disruptive effects of new court-ordered elections. They may be read as implicitly adopting (or at least approving) something like the approach I suggest, for they state that pre-election relief for Title I violations will not intrude upon or disrupt internal union procedures. *See* Note, "Union Elections and the LMRDA," 81 Yale L.J. 407, 558–59 (1972); Comment, "Titles I & IV of the LMRDA," 42 U.Chi.L.Rev. 166, 179 (1974); James, "Union Democracy and the LMRDA," 13 Harv.C.R.C.L.L.Rev. 247, 316–17 (1978).

The language of the statute itself lends further support to the formulation I favor. Section 483 states first that no union "shall be required by law to conduct elections of officers . . . in a different form or manner than is required by its own constitution or bylaws, except as provided by" Title IV. This should caution us to be wary of sanctioning new elections under court-imposed rules. The statute goes on to set up a dichotomy between the time "prior to the conduct" of an election, when "existing rights and remedies to enforce the constitution and bylaws" of the union are enforceable, and the time after an election is "already conducted," when only Title IV is available for "challenging an election." It seems to me that what plaintiffs are doing here really is challenging an election: they want this one thrown out, and everything begun over again. This will always be true when a new election is required. Thus, an approach looking to the remedy seems a sensible way of deciding whether an election has already been conducted for the purposes of this statute, since the statute itself speaks of challenging the election. Moreover, Title IV explicitly gives the Secretary the power to supervise a new election after a court determination of a violation. *See* section 482(c). Title I, on the other hand, while containing a catch-all provision allowing for "appropriate" relief, including injunctions, contains no explicit reference to court supervision of an election. *See* section 412.

The approach suggested would have several benefits: it would respond to the concerns of Congress and the Supreme Court, and it would be flexible, not sanctioning court supervision of elections under Title I, but not prohibiting swift relief under Title I for violations that may be cured without a new election. This would also correspond to the dividing line between the courts' and the Secretary's expertise and areas of effectiveness.

Accordingly, I respectfully dissent from the decision and judgment of the court.